UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **MVP KOSHER FOODS LLC** | | |
| Plaintiff, | | 14-cv-6072 (SJF) (ARL) |
| -against- | | |
| **EMPIRE KOSHER POULTRY, INC.** | | **AMENDED COMPLAINT** |
| Defendant. | | |

Plaintiff MVP Kosher Foods LLC, by its attorneys, as for its Amended Complaint, alleges:

## NATURE OF THE ACTION

1.     MVP Kosher Foods LLC ("**MVP**" or "**Plaintiff**") brings this action asserting quasi-contract and contract claims against Empire Kosher Poultry, Inc. ("**Empire**" or "**Defendant**") for Empire's failure to provide any compensation to MVP after MVP transferred its customers, sales volume, and farming infrastructure to Empire.

## PARTIES

2.     Plaintiff MVP has its principal place of business at 22 Willow Road, Woodmere, New York 11598.

3.     Defendant Empire, upon information and belief, is a corporation that transacts business in the State of New York.

## JURISDICTION AND VENUE

4.     On October 16, 2014, Defendant removed this action from the Supreme Court of the State of New York, County of Nassau based on diversity jurisdiction.

## FACTS

5.      MVP was a kosher poultry processor with a poultry processing plant located in Birdsboro, Pennsylvania (the "**Birdsboro plant**").  MVP was formed in 2010 by the amalgamation in December 2010 of Mehadrin Kosher Poultry and the acquisition of certain assets from Vineland Kosher Poultry.  Mehadrin Kosher Poultry and Vineland Kosher Poultry were competitors in the strictly kosher poultry market and MVP sought by their combination to benefit from increased market dominance.  MVP and its investors paid over $7,000,000 for these acquisitions and invested over $10,500,000 in this venture which includes working capital.

6.      MVP sold its processed poultry to wholesalers and distributors under its two major brand names, the Mehadrin label and the Vineland label.  MVP's sales in 2011 were approximately $40 million and it employed approximately 200 people as of July 1, 2012.  MVP's Chairman of the Board Officer is Mark Honigsfeld ("**MVP's COB**") and he has held this position since MVP's inception.

7.      Empire is also a kosher poultry processor.  Empire, upon information and belief, is the largest producer of kosher poultry in the United States, has annual revenue in excess of $100,000,000, and has approximately 750 employees.  Empire's poultry processing plant is located in Mifflintown, Pennsylvania, which is approximately a two hour drive from MVP' former poultry processing plant.  Empire's Chief Executive Officer from 2006 until October 2012 was Greg Rosenbaum ("**Empire's CEO**").  In October 2012, Jeff Brown became Empire's Chief Executive Officer prior to which he was Empire's Chief Operations Officer.

8.      MVP and Empire (which also processes kosher poultry for Alle Processing) were competitors in the market for strictly kosher poultry.  In July 2012, there were two other significant

2

processors of kosher poultry for the strictly kosher market: Aaron's a/k/a Agri Processors (located in Iowa) and KJ Poultry (located in Monroe, New York).

## I.   MVP'S GROW OUT PROGRAM

9.     A core requirement to become a successful and major kosher poultry processor is to have control over all aspects of production from breeding, egg setting and hatching, raising the chicks to full weight for slaughter, actual slaughter, processing and packaging, to the final delivery to the wholesaler or retailer.  The reason having control from breeding until final sale by the processor is important is because, *inter alia*, Jewish law requires that for poultry to be kosher the chicken must be traceable from hatching until sale.  Having control of this entire process is also essential to assure a proper breed of chicken, dependable uninterrupted supply, and reasonable costs of live birds.  A large poultry processor which is not "vertically" integrated in the manner described above would be unlikely to be able to meet the requirements of Jewish law and/or would have increased costs that would make them uncompetitive and hence unlikely to survive as a going concern.

10.     As a first step to vertical integration, large kosher poultry processors typically pay a hatchery for an egg set and ultimate chick, and then pay farmers to raise the chicks into chickens. The optimum growing time for chickens is approximately twelve weeks, which includes six weeks of incubation from the time the egg is set and then another six weeks from hatching to slaughter. During that time, while the hatchery hatches and farmers tend to and feed the chickens, the chickens are the property of the processor, and the processor remains responsible for providing feed, vitamins, chemicals and nutrients, as well as remains responsible for any mortality. Generally, at the end of the twelve week period (which period could be longer depending on the

final weight of the bird), the chickens are delivered to the slaughter house.  (The process in this paragraph shall collectively be referred to as a "**Grow Out Program**").

11. MVP purchased Vineland Kosher Poultry in December 2010 primarily to obtain its Grow Out Program, hence allowing MVP to immediately enter into the kosher poultry processing business with a steady supply of birds meeting the strictures of Jewish law and a competitive cost of production, and importantly, allowed for a seamless transition of the Vineland label and its sales volume and customers from Vineland Kosher Poultry to MVP.  The Grow Out Program acquired from Vineland Kosher Poultry included approximately 600,000 chickens at various stages of growth at over 20 farms throughout the Pennsylvania and New Jersey region that primarily raised chickens for Vineland Kosher Poultry, as well as feed, vitamins, chemicals and nutrients owned by Vineland Kosher Poultry at these farms.

12. By July 2012, in order to cover its needs for the Vineland and Mehadrin brands, MVP had significantly expanded and increased, both in size and value, the Grow Out Program it purchased from Vineland.  Specifically, by July 2012, MVP had over 1.5 million chickens in various stages of growth at over 30 farms throughout the Pennsylvania and New Jersey area that raised chickens primarily for MVP; MVP had an inventory of feed, vitamins, chemicals and nutrients on these farms; and MVP also had tens of thousands of eggs being hatched in order to continue the chain of supply (collectively, "**MVP's Grow Out Program**").

## II.  NEGOTIATIONS BEGIN BETWEEN EMPIRE AND MVP

13. In May 2012, Mr. Honigsfeld, MVP's COB, on behalf of MVP, and Mr. Rosenbaum, Empire's CEO, on behalf of Empire, began negotiating the potential acquisition of MVP by Empire.  Their first meeting discussing this potential acquisition occurred on May 8, 2012 in a private conference room reserved by Empire's CEO at La Guardia Airport in New York City.

14.     At that meeting, MVP's business model and pricing information were discussed, with a lot of discussion revolving around MVP's "ice pack" business (which refers to sales of MVP poultry in bulk without each chicken being individually wrapped and labeled with a particular brand).  At that time, Empire's master distributor for its entire "ice pack" business was Alle Processing (and Alle Processing only purchased chickens from Empire).  One of the critical pieces of information discussed during that meeting was that MVP's pricing for its "ice pack" customers was significantly higher than the pricing charged by Empire to its "ice pack" master distributor Alle Processing.  Specifically, the difference was approximately five cents per pound that MVP commanded for the very same product of unbranded processed poultry (which had an average overall price of $1.55 pound).  MVP's COB and Empire's CEO agreed that if MVP's Grow Out Program and concomitant "ice pack" business were turned over to Empire, it could continue to maintain this spread with MVP's former customers.

15.     Further, it was understood that if Empire was to capture MVP's market share, it would also need to immediately acquire MVP's Grow Out Program. They conservatively assumed that if this happened, Empire would lock-in seventy-five percent of MVP's sales volume, which at that time was approximately $40,000,000, hence an increased sales volume to Empire of $30,000,000.  Putting aside the additional increase in revenue of $30,000,000, Empire's CEO and MVP's CEO predicted that the five cent spread for the "ice pack" business alone would generate an additional $1,000,000 in income per year for Empire which it would have otherwise not been able to command.  This formed the basis at the meeting for a minimum $4 million royalty payment from Empire to MVP if it transferred its Grow Out Program and concomitant sales volume and "ice pack" business to Empire.

16.     This meeting was prescient because when MVP did close down and transfer its Grow Out Program and concomitant business to Empire, what MVP's COB and Empire's CEO predicated is apparently what happened.  Empire became the immediate benefactor of almost all of MVP's sales volume since, having taken over the Grow Out Program, it was able to immediately handle the additional volume; and concurrently, on information and belief, Alle Processing, Empire's master distributor for "ice pack," experienced almost the same increase in sales volume as the volume of "ice pack" business formerly handled by MVP.

17.     Other more standard benefits to Empire were also discussed at the LaGuardia airport conference room meeting, including that the closure of MVP would: result in a less competitive landscape for Empire by eliminating two major brands (Vineland and Mehadrin), cause an increase for demand for Empire products, permit Empire to command a higher price for its products, allow Empire to more fully utilize its plant which was underutilized, and result in other basic economic benefits that flowed from eliminating a major competitor in a business landscape which already had few major kosher poultry processors.

18.     On the heels of the May 8, 2012 meeting, MVP's COB provided to Empire's CEO various financial information regarding MVP, including MVP's detailed balance sheet, and customer pricing through redacted MVP invoices to its customers.

19.     By the end of May 2012, draft terms sheets were circulated reflecting the terms for a deal by which MVP would file for bankruptcy under Chapter 11 of the United States Bankruptcy Code and Empire would as a "stalking horse" acquire, *inter alia*, Empire's assets and in return pay, *inter alia*, royalty payments amounting to between $4,000,000 and $8,000,000, depending on the amount of customer volume realized by Empire after shutting down MVP's facility and

obtaining its Grow Out Program and additional cash as upfront payment for other assets and intangibles to cover certain expenses of MVP in discontinuing its operations.

20.      On May 30, 2012, due to MVP's deteriorating cash flow situation, MVP's COB informed Empire's CEO that MVP either needs to have a deal in place with Empire or otherwise MVP will need to obtain financing from a third-party which will in turn "create challenges for our deal [the deal between MVP and Empire]."  Empire's CEO responds to MVP's COB that "I'm on top of the timing and understand.  We'll progress tonight and should be able to get agreement among ourselves tomorrow."

21.      On June 1, 2012, Empire's Chief Operating Officer ("**Empire's COO**") sends a redlined draft term sheet to MVP's COB for the acquisition of MVP by Empire.  This draft term sheet was never signed by either party.

22.      On June 4, 2013, MVP's COB received an offer of $3,000,000 from a third party offering to purchase secured notes due from MVP and owned directly or indirectly by investors in MVP.  The offer also provided that "time is of the essence and [that the offeror] would like to complete the transaction by June 15, 2012."

23.      Empire's CEO advised MVP's COB that Empire's offer would provide a better deal for MVP than the $3,000,000 offer.

24.      On June 5, 2012 at 12:40 p.m., Empire's CEO advises MVP's COB that "hopefully, by tonight or tomorrow morning, we'll have the loose ends, legal and business, wrapped up."

25.      On June 6, 2012, Empire's CEO provides another redlined draft term sheet to MVP's COB and notes that "I hope we are pretty close here."  This draft term sheet was never signed by either party.

26.     On June 7, 2013, Empire's CEO emails MVP's COB that "I did not hear anything from you last night or today? … Do you want to move forward?" because if so "I'd like to get our swat team ready to move on Monday [June 11, 2012] if we are going forward."  MVP's COB responds that "Of course I want to move forward" but that he needs to have the attorneys "finish up" and the final term sheet presented.

27.     On June 11, 2012, Empire's CEO emails MVP's COB addressing certain points of contention and provides assurance to MVP's COB that "we [at Empire] are honorable and do what we say we'll do."

28.     On June 12, 2012, another redrafted version of the term sheet is sent to MVP's COB.  This draft term sheet was never signed by either party.

### III.   UNDERSTANDING REACHED BETWEEN EMPIRE AND MVP

29.     On June 27, 2012, Empire's CEO sends an email to MVP's COB outlining a number of issues that remained open which delayed moving forward with the anticipated deal by which Empire would acquire most of MVP's assets within the context of a Chapter 11 bankruptcy. Empire's CEO summarizes the issues as follows: "1) the DIP [Debtor In Possession] budget, so we know how much money is going to be needed; 2) the lease proposal, so we can see how that works to make more money available going forward to finance operations in bankruptcy; 3) an updated, to the minute, receivables balance and a confirmation of the carve out for legal fees request; 4) a way for the lawyers to agree on whatever remaining collateral for the DIP there may be."

30.     Despite these open issues, at the end of this same email, Empire's CEO makes the following alternative offer to MVP's COB: "If we cannot get satisfactory closure on these issues, it may make some sense for you and I to discuss something short of a [Chapter 11] filing this week,

perhaps where you close down your operations and have us manufacture for you, giving you a margin going forward.  If we are to consider this, we believe we could be up and running Monday [July 2, 2012]… Why don't you digest it and then we can talk."

31.    MVP's COB then digested the proposal from Empire's CEO and due to MVP's cash flow issues, the upcoming Jewish holiday season which is the busiest sales period of the year, and understanding that Empire was committed to finalizing a transaction with MVP, the two of them reached an understanding based on Empire's CEO's proposal which committed them to a course of conduct by which MVP would immediately transfer its entire value to Empire.

32.    The terms of this understanding were essentially as follows: MVP would shut down its plant, cease processing kosher poultry, transfer to Empire its Grow Out Program (including 1.5 million birds along with feed, vitamins, chemicals and nutrients and over 30 farming relationships to grow these birds), facilitate the transfer to Empire of its customers and sales volume (which in 2011 was approximately $40,000,000 and for the six months ending June 30, 2012 was approximately $20,000,000) and provide further assurances that the Mehadrin and Vineland brands would not be revived in the future and facilitate negotiations with the owner of the Birdsboro plant.  In exchange for the foregoing it was further understood that MVP would be entitled to royalty payments of a guaranteed minimum of $4,000,000 to a maximum of $8,000,000 depending on the increase in sales volume, $250,000 for growers, $200,000 for legal and other expenses, approximately $200,000 in severance payments to various MVP employees, and payment of ninety percent (90%) of the published spot market price for the live birds transferred to Empire.  This collective understanding shall be referred to as the "**Transfer Framework**".

33.    Empire's ability to capture and maintain MVP's customers and sales volume was dependent on adherence to the terms of the Transfer Framework and most critically MVP closing

its operations and Empire obtaining MVP's Grow Out Program.  Without acquiring MVP's Grow Out Program, Empire would not have had the increase in supply of an additional 100,000 to 200,000 chickens a week necessary to meet the increase in demand from MVP's former customers. Indeed, to meet the strictures of Jewish law and secure poultry at a competitive price to slaughter, without acquiring MVP's Grow Out Program, Empire would have had to build out an entire Grow Out Program to produce an additional 100,000 to 200,000 chickens which, even once set up, would have then taken at least twelve weeks to grow its first chicken for slaughter.

34.     Empire was also eager to absorb MVP's Grow Out Program because of the upcoming Jewish holiday season during which there was typically a lack of supply to fully meet demand.  The timing of the Transfer Framework and subsequent transfer of MVP's Grow Out Program during the peak demand period for kosher poultry positioned Empire to be the only major processor in the position to capture additional market share upon MVP's closing because other kosher poultry processors (unless they planned well in advance) would have been unlikely to have had additional supply to capture any of MVP's former volume and customers.

35.     The basis for the $4,000,000 minimum royalty payment was the same basis discussed supra between Empire and MVP at the LaGuardia Airport conference room on May 8, 2012.  The $250,000, $200,000 and approximately $200,000 for growers, legal and other expenses, and severance payments for MVP employees, respectively, reflected the immediacy of the transaction and that Empire would be taking over MVP's operations.

36.     Finally, the reason ninety percent (90%) of published spot price for the birds was agreed to was because Empire, unlike MVP, had its own hatchery and feed mill, hence Empire's cost for raising a bird from hatching to slaughter was ten percent (10%) less than MVP's cost.  To reflect this difference, and in light of the other terms of their agreement including the guaranteed

minimum royalty payment, it was agreed that MVP -- which could have otherwise sold these birds on the open market for at least their published spot price -- would sell these birds to Empire for only ninety percent (90%) of the published spot for live birds.

## IV.    MVP'S VALUE TRANSFERRED AND ABSORBED BY EMPIRE

37.    With the Transfer Framework in place, a team of officers, employees and agents from Empire, including their Chief Operating Officer, immediately began working with a team from MVP to close down MVP's plant and transfer MVP's Grow Out Program, customers and sales volume to Empire.

38.    On July 5, 2012, Empire's COO informed MVP's COO that "Our staff has actually been working on an operations plan all week and we believe we are ready to transition your production needs to Empire quickly."

39.    The respective teams from Empire and MVP worked feverishly to prepare for the closure of MVP's plant and the transfer of the Grow Out Program to Empire in order to assure a smooth transition of MVP's sales volume to Empire.

40.    On July 10, 2012 in the early morning, MVP's COB outlines to Empire's CEO many of the transition details including the termination of certain MVP employees, the retention of other MVP employees by Empire, the transition of MVP's Chief Financial Officer to Empire, incentive packages for certain MVP personnel to be paid for by Empire, and various details regarding the transfer of the MVP's Grow Out Program to Empire.

41.    In the early morning of July 10, 2012, MVP's COB also unequivocally advises Empire's CEO via email that he has "put everything in motion to shut down Thursday [July 12, 2012] and begin production at Empire Monday [July 16, 2012]" adding that MVP's COO "is also planning accordingly and we are all putting a lot of faith in each other's ability to steer this along."

In that same email, MVP's COB plainly states to Empire's CEO that "MVP is counting on the same financial terms as we have both agreed to which includes the $250k for growers and $200k toward the legal and other expenses."

42.    On July 10, 2012, Empire's COO responds to the foregoing by stating that "We have a ton of logistics we need to figure out if we are to start next week."  MVP's COB responds by stating that "No 'if' please, that scares me!  It is happening.  I pulled the trigger with your agreement."  Empire's COO responds by advising MVP's COB that "We will pull this off!!"

43.    In the evening of July 10, 2012, Empire requests that MVP provide a listing of MVP's customer names along with their billing address, shipping address, customers payment terms, and customer credit limit, as well a list of all customers which conduct business with MVP utilizing EDI (an electronic payment system where vendors automatically receive and can pay their bills, and hence turning over this system essentially gave Empire all of MVP's customers' banking information).  MVP complies with this request.  Empire further requests a SKU listing of MVP's products, indicating SKU number, description and year-to-date sales volume for each. MVP also complies with this request.

44.    On the evening of July 10, 2012, Empire's COO circulates another draft term sheet which, while modifying certain aspects of the prior term sheet, remains true to the terms of the Transfer Framework.  This draft term sheet was never signed by either party.

45.    On July 11, 2012, as part of the continuing effort to transfer to Empire the items outlined in the Transfer Framework, Empire's COO emails MVP's COB and MVP's then CFO, Tony Hill, stating "Thanks for the call today about the live operations transitions. … In order to properly transition feed delivery as early as next Monday-Tuesday and live haul later in the week, we need all of the following no later than close of business tomorrow.  We will be working all

weekend at the mill to pull this off so it's very important that we have everything requested.  …
● Head count of REO flocks and updated weight ● Current houses, number of bins and bin sizes
can bin be opened from ground? … ● Directions to farms along with contact information ●
Current feed inventory and mortality as of Thursday July 12, 2012 (Please also inform us of future
pending deliveries) ● Previous 18 months of cocci control programs ● Current placement
commitments from supplying hatcheries and point of contacts for hatcheries ● Need information
from oldest live birds in field in most recent sets/commitments. ● Flock service reports including
medication treatment records for all birds presently in field. ● Current weight of flock from June
8th placement to oldest in field ● Actual delivered chick cost from North Star and Moyer's for
most recent placed chicks. ● Can a platform truck be used on all two-story houses or telescoping
lift to load birds using cages." On July 11, 2012, MVP's CFO provides responses to each of these
requests.

46.     On July 12, 2012, as agreed between the parties, MVP closed its poultry processing
plant which had approximately 200 employees, ceased processing kosher poultry, and kept on only
a skeleton crew of approximately ten employees to complete the transition to Empire.

47.     By July 16, 2012, MVP's COB is requesting the agreement of Empire's COO
before releasing feed for chickens, to which Empire's COO provides approval.  Later that day,
Empire's COO even sends an email to MVP's COB and then CFO explaining to them what he had
previously *ordered* them to do regarding feed: "My specific orders were to send feed to all farms
currently out of feed tonight and then tomorrow we can deal with the rest."  By the end of the day,
Empire's COO has advised that his team had visited all of the farms with MVP's chickens and that
Empire would come up with a plan for each.  Soon after, Empire took over MVP's entire supply
chain of chickens, including controlling their movement, feed, and use.

48.     During this period, all of MVP's proprietary information regarding its Grow Out Program was being transferred to Empire to assist in its transition to Empire.

49.     On July 18, 2012, since Empire is already capturing MVP's former sales volume and customers, MVP's COB even suggests to Empire's CEO that Empire hire two of MVP's four salespeople to represent Empire.

50.     Also on July 18, 2012, in recognition that Empire's sales volume has increased due to the MVP's closure pursuant to the Transfer Framework and that Empire had committed to making royalty payments to MVP related to same, Empire's CEO states that they "will keep this bump [in Empire's sales] out of the baseline for royalty determination."

51.     On July 20, 2012, MVP's COB sends to Empire's CEO, *inter alia*, MVP's weekly reports, daily sales and production data, reports prepared for MVP's investor call, weekly comparison prices, revised sales report, sales production, accounts payable, accounts receivable and eligibility calculation reports, and sales, production and accounts receivable reports.

52.     On July 23, 2012, MVP's COB receives a request for payment regarding feed and asks Empire's COO: "Can you tell me if MVP should pay this? I am not sure if this is for flocks that were prior to our current arrangement wit[h] Empire."

53.     Also on July 23, 2012, Empire's COO asks MVP's COB: "Please send me your outside sales staff name and contact numbers. I want to interview them to understand their accounts and contacts and gauge Empire's interest in them."

54.     On July 25, 2012, MVP's COB is asking Empire's CEO for instructions on how Empire wants to handle finalizing the shutdown of the MVP's plant by pumping out the refrigeration unit therein.

55.     On July 27, 2012, MVP's COB confirms with Empire's CEO and Empire's COO that as of September 1, 2012, MVP's skeleton crew of approximately ten people will disband with five members of this team transferring over to work for Empire, as well as finalizing Empire's severance payments to a number of former MVP employees.

56.     On July 28, 2012, MVP sends to Empire its budgets and cash flow for the next twelve weeks, including assumptions related to same, and specific information regarding, *inter alia*, accounts receivable, sales, collections, payroll, feed, hatchery, growers, catching, hauling, turkey purchases, salt, packaging, uniform, water treatment, sewer, trucking, ice, warehousing, auto expense, computer systems, equipment lease, factor supplies, office supplies, rent expenses, repairs and maintenance, sales commissions, taxes, telephone expenses, utilities, and insurance.

## V.     BENEFITS REALIZED BY EMPIRE

57.     By the end of July, MVP had honored its end of the Transfer Framework by closing its plant, ceasing processing kosher poultry, and transferring its Grow Out Program, customers and sales volume to Empire. This included Empire acquiring approximately 1.5 million of MVP's birds as well as silos with feed, vitamins, chemicals and nutrients owned by MVP located at over 30 farms on which MVP's birds were being raised as well as the relationships with these over 30 farms which had primarily raised chickens for MVP.

58.     By MVP honoring its end of the Transfer Framework and transferring its Grow Out Program to Empire, Empire benefited from a significant increase in sales volume.   Upon information and belief, based on the increase in sales experienced by Empire in the last half of July, August and September, Empire realized an annualized sales increase of approximately $30,000,000 and had its first profitable July and August in recent memory.   Hence, it appears that

the prediction made at the initial meeting of Empire's CEO and MVP's COB on May 8, 2013, that Empire would experience an annualized sales increase of $30,000,000, was realized.

59.     By MVP honoring its end of the Transfer Framework, there was also an increase in market price Empire could charge for its chickens due to less competition by the elimination of two major competitive brands, Vineland and Mehadrin.  Empire not only was able to increase its pricing for its existing chicken sales, it also acquired to MVP's "ice pack" business and was able to command the five cent premium for this business, which Empire's CEO estimated alone amounted to an additional $1,000,000 in profit for Empire a year.

60.     By MVP honoring its end of the Transfer Framework, Empire also benefited from being able to achieve greater utilization of its processing plant which had previously been significantly underutilized.  This allowed Empire to decrease its cost of production per pound of poultry, and at the same time, due to having less competition, increase the price it charged per pound of poultry.

61.     It was now time for Empire to honor its end of the bargain.

## VI.     EMPIRE'S BOARD APPROVES THE DEAL

62.     On August 17, 2012, Empire's CEO advises MVP's COB that Empire's "board is standing by to approve final details."

63.     On September 11, 2012, when all remaining open terms had been closed and the terms of the deal finalized, Empire's CEO advises MVP's COB that "The board voted in favor of the deal, so tomorrow, Merrill and Baupost have to waive their investor rights to object, after which we can sign."

## VII.   **EMPIRE RENEGES**

64.     On October 12, 2012, MVP's COB received a phone call from Empire's CEO saying he is limited with what he is allowed to say but that he is no longer the CEO of Empire and MVP's COB understood from this conversation that Empire's CEO was not able to remain as CEO of Empire because Empire would not honor the commitment that Empire made to MVP.  It was reported that Empire's CEO no longer held this position at Empire because of his dispute with Empire's board regarding the deal with MVP.

65.     Following the call of October 12, 2012, MVP's COB left several voicemails for the new CEO of Empire, Jeff Brown.   When these voicemails went unanswered, on October 16, 2012, MVP's COB sent an email to Empire's new CEO stating "Please give me the courtesy of a response.  Are you going to call me?"  Shortly thereafter, MVP's COB received a phone call from one of Empire's board members stating that Empire has decided "not to proceed."  MVP's COB responded that Empire has already proceeded by obtaining MVP's business; the call was then abruptly ended by Empire's board member.

66.     After Empire had already obtained all of the value and benefits from the Transfer Framework and after it already stated that its board approved the transaction, Empire without any explanation advised it had decided not to honor the Transfer Framework.   Empire also transparently waited until the end of the holiday season, when demand was no longer acute and it had already captured MVP's sales volume, to advise MVP that it no longer intended to proceed. Empire also conveniently waited months after the Transfer Framework was discussed, months after the hundreds of communications between MVP and Empire's personnel transferring MVP's Grow Out Program and value to Empire, weeks after it hired MVP's CFO and other personnel, and weeks after it received almost all of MVP Kosher's proprietary data, and after it was assured

17

there was nothing left it could milk from MVP, before it informed MVP, without any explanation, that the Empire board decided not to provide MVP with any compensation for the value it had already received from MVP.

## CAUSES OF ACTION

### COUNT I
#### UNJUST ENRICHMENT

67.     Plaintiff incorporates the preceding paragraphs as though set forth herein.

68.     Pursuant to MVP's understanding with Empire, MVP rejected other offers to purchase its business or provide financing, MVP shut down its processing plant, laid off its approximately 200 employees, arranged for the hiring of certain of its personnel by Empire, arranged for the hiring of its Chief Financial Officer by Empire, transferred its proprietary financial, sales and customer data to Empire, transferred its customers and sales volume to Empire, and transferred its Grow Out Program to Empire.

69.     Empire was unjustly enriched by obtaining MVP's Grow Out Program.  MVP's Grow Out Program included 1.5 million birds along with feed, vitamins, chemicals and nutrients and over 30 farming relationships to grow these birds, as well as tens of thousands of chicks being hatched in order to continue the chain of supply, allowing Empire to increase its chicken production by 100,000 to 200,000 chickens per week on a going forward basis.  This increase in supply of chickens was critical to absorb MVP's former customers and supply as well as capitalize on the additional demand of the then upcoming Jewish holiday season when major kosher poultry processes would almost certainly not have had additional supply to capture MVP's former customers and volume.

70.     Concomitant with Empire obtaining MVP's Grow Out Program, Empire was unjustly enriched by obtaining from MVP its former customers and sales volume which, upon

18

information and belief, allowed Empire to realize (based on the increase in sales experienced by Empire in the last half of July, August and September) increased annualized sales of approximately $30,000,000.  Empire was also unjustly enriched by, upon information and belief, having its first profitable July and August in recent memory.

71.     Empire was also unjustly enriched by an increase in the market price it could charge for its chickens due to less competition by the elimination of two major competitive brands, Vineland and Mehadrin.  Empire not only was able to increase its pricing for its existing chicken sales, it also acquired to MVP's "ice pack" business and was able to command the five cent premium for this business, which Empire's CEO estimated alone amounted to an additional $1,000,000 in profit for Empire a year.

72.     Empire was also unjustly enriched by being able to achieve greater utilization of its processing plant which had previously been significantly underutilized.  This allowed Empire to decrease its cost of production per pound of poultry, and at the same time, due to having less competition, increase the price it charged per pound of poultry.

73.     All of the above enumerated benefits unjustly obtained by Empire were specifically discussed between Empire's CEO and MVP's COB and were what both parties expected would be the result of MVP's honoring its commitments to close down its plant, cease processing kosher poultry, transfer its Grow Out Program to Empire and facilitate the transfer of its customers and sales volume to Empire.

74.     MVP even turned down other offers, including a $3,000,000 offer, based on representations that its deal with Empire provided better terms and would be honored by Empire. MVP would simply not have transferred almost all of its value to Empire, and even provided below market pricing for its chickens, without Empire's promise that it would honor their understanding.

As explained by Empire's CEO, "we are honorable and do what we say we'll do."  MVP trusted

that Empire would indeed act honorably.

75.     It would be against equity and good conscience to permit Empire to retain the

benefits it obtained from MVP without providing adequate compensation.

76.     By reason of the foregoing, Plaintiff is entitled to damages equivalent to the value

of all of the benefits obtained by Empire, including but not limited to the value of the increase in

sales volume experienced by Empire's processing plant, the value of acquiring MVP's Grow Out

Program (including the 1.5 million birds, the 30 farming relationships, and the silos of feed,

vitamins, chemicals and nutrients), the value of the customer lists it obtained, the value of the

increase in market price Empire could command by the closure of MVP, and the value of being

able to utilize its plant at full capacity.

## COUNT II
### PROMISSORY ESTOPPEL
### EMPIRE PROMISES TO PROVIDE VALUE FOR TRANSFER OF MVP VALUE TO EMPIRE

77.     Plaintiff incorporates the preceding paragraphs as though set forth herein.

78.     On June 27, 2012, despite certain open issues, Empire's CEO makes the following

offer to MVP's COB: "If we cannot get satisfactory closure on these issues, it may make some

sense for you and I to discuss something short of a [Chapter 11] filing this week, perhaps where

you close down your operations and have us manufacture for you, giving you a margin going

forward.  If we are to consider this, we believe we could be up and running Monday [July 2,

2012]… Why don't you digest it and then we can talk."

79.     MVP's COB then digested the proposal from Empire's CEO and due to MVP's

cash flow issues, the upcoming Jewish holiday season, and understanding that Empire was

committed to finalizing a transaction with MVP, the two of them reached an understanding based

on Empire's CEO's proposal which committed them to a course of conduct by which MVP would immediately transfer the majority of its tangible and intangible value to Empire.

80.     The terms of this understanding were essentially as follows: MVP would shut down its plant, cease processing kosher poultry, transfer to Empire its Grow Out Program (including 1.5 million birds along with feed, vitamins, chemicals and nutrients and over 30 farming relationships to grow these birds), facilitate the transfer to Empire of its customers and sales volume (which in 2011 was approximately $40,000,000 and for the six months ending June 30, 2012 was approximately $20,000,000) and provide further assurances that the Mehadrin and Vineland brands would not be revived in the future and facilitate negotiations with the owner of the Birdsboro plant (collectively, the "**MVP Promises**").  In exchange for the foregoing it was further understood that MVP would be entitled to royalty payments of a guaranteed minimum of $4,000,000 to a maximum of $8,000,000 depending on the increase in sales volume, $250,000 for growers, $200,000 for legal and other expenses, approximately $200,000 in severance payments to various MVP employees, and payment of ninety percent (90%) of the published spot market price for the live birds transferred to Empire (collectively, the "**Empire Promises**").

81.     Relying on the exchange of promises between the parties, MVP fully honored the MVP Promises, including shutting down its plant, ceasing to process kosher poultry, transferring its Grow Out Program to Empire and facilitating the transfer of its customers and sales volume to Empire.

82.     After MVP honored the MVP Promises, however, Empire refused to honor its promise to provide compensation for the transfer of MVP's value to Empire or to honor the Empire Promises.

83. Empire's refusal to honor its promise to provide compensation for the transfer of MVP's value to Empire or to honor the Empire Promises, which MVP reasonably relied upon when it honored the MVP Promises, has caused MVP to be injured by, *inter alia*, having transferred to Empire virtually the entire value of its business and not receiving any compensation for that transfer.

84. By reason of the foregoing, Plaintiff's suffered damages which include deprivation of royalty payments of between $4,000,000 to $8,000,000 depending on the increase in sales volume experienced, $250,000 for growers, $200,000 for legal and other expenses, approximately $200,000 in severance payments to various MVP employees, and payment of ninety percent (90%) of the spot market price for the live birds transferred to Empire.

## COUNT III
### BREACH OF CONTRACT – BINDING PRELIMINARY AGREEMENT

85. Plaintiff incorporates the preceding paragraphs as though set forth herein.

86. On June 27, 2012, Empire's CEO writes to MVP's COB the following: "If we cannot get satisfactory closure on these issues, it may make some sense for you and I to discuss something short of a [Chapter 11] filing this week, perhaps where you close down your operations and have us manufacture for you, giving you a margin going forward. If we are to consider this, we believe we could be up and running Monday [July 2, 2012]… Why don't you digest it and then we can talk."

87. MVP's COB then digested the proposal from Empire's CEO, and because of the exigencies and business reality of the situation which required immediate action, the two of them reached an agreement as follows: (i) MVP would shut down its plant, (ii) cease processing kosher poultry, (iii) transfer to Empire its Grow Out Program (including 1.5 million birds along with feed, vitamins, chemicals and nutrients and over 30 farming relationships to grow these birds), (iv)

22

facilitate the transfer to Empire of its customers and sales volume (which in 2011 was approximately $40,000,000 and for the six months ending June 30, 2012 was approximately $20,000,000) and (v) provide further assurances that the Mehadrin and Vineland brands would not be revived in the future and facilitate negotiations with the owner of the Birdsboro plant; in exchange for the foregoing it was further understood that MVP would be entitled to (vi) royalty payments of a guaranteed minimum of $4,000,000 to a maximum of $8,000,000 depending on the increase in sales volume, (vii) $250,000 for growers, (viii) $200,000 for legal and other expenses, (ix) approximately $200,000 in severance payments to various MVP employees, and (x) payment of ninety percent (90%) of the published spot market price for the live birds transferred to Empire. This collective agreement shall be referred to as the "**Binding Preliminary Agreement**".

88.     MVP subsequent to the Binding Preliminary Commitment fully performed its obligations pursuant to its terms, including shutting down its plant, ceasing to process kosher poultry, transferring its Grow Out Program to Empire and facilitating the transfer of its customers and sales volume to Empire.

89.     The Binding Preliminary Commitment was reached due to the exigencies of the circumstances, including MVP's cash flow issue and the upcoming Jewish holidays, and having committed itself to the Binding Preliminary Agreement, Empire was obligated to negotiate in good faith towards finalizing the transaction.

90.     All open issues were in fact closed when the Empire board voted to approve the deal between Empire and MVP on September 11, 2012.  The subsequent rejection of the Empire board without any explanation – and after taking control of MVP's operations and cannibalizing its value – was not done in good faith.

91.     By reason of the foregoing, Plaintiff's suffered damages which include deprivation of royalty payments of between $4,000,000 to $8,000,000 depending on the increase in sales volume experienced, $250,000 for growers, $200,000 for legal and other expenses, approximately $200,000 in severance payments to various MVP employees, and payment of ninety percent (90%) of the spot market price for the live birds transferred to Empire.

## COUNT IV
### BREACH OF CONTRACT – SUBSTANTIAL PERFORMANCE

92.     Plaintiff incorporates the preceding paragraphs as though set forth herein.

93.     On June 27, 2012, Empire's CEO writes to MVP's COB the following: "If we cannot get satisfactory closure on these issues, it may make some sense for you and I to discuss something short of a [Chapter 11] filing this week, perhaps where you close down your operations and have us manufacture for you, giving you a margin going forward.  If we are to consider this, we believe we could be up and running Monday [July 2, 2012]…  Why don't you digest it and then we can talk."

94.     MVP's COB then digested the proposal from Empire's CEO, and because of the exigencies and business reality of the situation which required immediate action, the two of them reached an agreement as follows: (i) MVP would shut down its plant, (ii) cease processing kosher poultry, (iii) transfer to Empire its Grow Out Program (including 1.5 million birds along with feed, vitamins, chemicals and nutrients and over 30 farming relationships to grow these birds), (iv) facilitate the transfer to Empire of its customers and sales volume (which in 2011 was approximately $40,000,000 and for the six months ending June 30, 2012 was approximately $20,000,000) and (v) provide further assurances that the Mehadrin and Vineland brands would not be revived in the future and facilitate negotiations with the owner of the Birdsboro plant; in exchange for the foregoing it was further understood that MVP would be entitled to (vi) royalty

24

payments of a guaranteed minimum of $4,000,000 to a maximum of $8,000,000 depending on the increase in sales volume, (vii) $250,000 for growers, (viii) $200,000 for legal and other expenses, (ix) approximately $200,000 in severance payments to various MVP employees, and (x) payment of ninety percent (90%) of the published spot market price for the live birds transferred to Empire. This collective agreement shall be referred to as the "**Transfer Agreement**".

95.     MVP subsequent to the Transfer Agreement not only substantially performed but fully performed its obligations pursuant to its terms, including shutting down its plant, ceasing to process kosher poultry, transferring its Grow Out Program to Empire and facilitating the transfer of its customers and sales volume to Empire.

96.     MVP having performed its obligations pursuant to the Transfer Agreement, Empire is now obligated to perform its obligation pursuant to this agreement.

97.     By reason of the foregoing, Plaintiff's suffered damages which include deprivation of royalty payments of between $4,000,000 to $8,000,000 depending on the increase in sales volume experienced, $250,000 for growers, $200,000 for legal and other expenses, approximately $200,000 in severance payments to various MVP employees, and payment of ninety percent (90%) of the spot market price for the live birds transferred to Empire.

**COUNT V**
**IMPLIED IN FACT CONTRACT**

98.     Plaintiff incorporates the preceding paragraphs as though set forth herein.

99.     On June 27, 2012, Empire's CEO writes to MVP's COB the following: "If we cannot get satisfactory closure on these issues, it may make some sense for you and I to discuss something short of a [Chapter 11] filing this week, perhaps where you close down your operations and have us manufacture for you, giving you a margin going forward. If we are to consider this,

we believe we could be up and running Monday [July 2, 2012]… Why don't you digest it and then we can talk."

100.    MVP's COB then digested the proposal from Empire's CEO, and because of the exigencies and business reality of the situation which required immediate action, the two of them reached an agreement as follows: (i) MVP would shut down its plant, (ii) cease processing kosher poultry, (iii) transfer to Empire its Grow Out Program (including 1.5 million birds along with feed, vitamins, chemicals and nutrients and over 30 farming relationships to grow these birds), (iv) facilitate the transfer to Empire of its customers and sales volume (which in 2011 was approximately $40,000,000 and for the six months ending June 30, 2012 was approximately $20,000,000) and (v) provide further assurances that the Mehadrin and Vineland brands would not be revived in the future and facilitate negotiations with the owner of the Birdsboro plant; in exchange for the foregoing it was further understood that MVP would be entitled to (vi) royalty payments of a guaranteed minimum of $4,000,000 to a maximum of $8,000,000 depending on the increase in sales volume, (vii) $250,000 for growers, (viii) $200,000 for legal and other expenses, (ix) approximately $200,000 in severance payments to various MVP employees, and (x) payment of ninety percent (90%) of the published spot market price for the live birds transferred to Empire.

101.    MVP subsequently performed its obligations pursuant to this agreement, including shutting down its plant, ceasing to process kosher poultry, transferring its Grow Out Program to Empire and facilitating the transfer of its customers and sales volume to Empire. Empire actively participated in affecting these transfers and fully accepted the benefits conferred upon it by these transfers but then failed at the last moment to uphold the final requirement of the agreement – providing compensation to MVP for the value Empire received. MVP performed its obligations

pursuant to the agreement; Empire is now obligated to perform its obligation pursuant to the agreement.

102.    By reason of the foregoing, Plaintiff's suffered damages which include deprivation of royalty payments of between $4,000,000 to $8,000,000 depending on the increase in sales volume experienced, $250,000 for growers, $200,000 for legal and other expenses, approximately $200,000 in severance payments to various MVP employees, and payment of ninety percent (90%) of the spot market price for the live birds transferred to Empire.

\* \* \*

103.    Pursuant to Federal Rule of Civil Procedure 8(a)(1)(3), all the foregoing Counts, when so required, are pled in the alternative.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment granting the following relief:

A.  As to Count I:

Damages equivalent to the value of all of the benefits obtained by Empire, including but not limited to the value of the increase in sales volume experienced by Empire's processing plant, the value of acquiring MVP's Grow Out Program (including the 1.5 million birds, the 30 farming relationships, and the silos of feed, vitamins, chemicals and nutrients), the value of the customer lists it obtained, the value of the increase in market price Empire could command by the closure of MVP, and the value of being able to utilize its plant at full capacity.

B.  As to Counts II through V:

Damages for failing to provide compensation to MVP including (i) $650,000, plus (ii) the guaranteed royalty payment of at least $4,000,000, plus (iii) a payment of ninety percent (90%) of the spot market price for birds transferred to Empire.

C.  As to All Counts:

Prejudgment and post judgment interest, any statutory fees to which Plaintiff may be entitled, and such other and further relief as this Court may deem just and proper.


## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury in this action of all issues so triable.


Dated:  November 6, 2014
     New York, New York             SIRI & GLIMSTAD LLP

_____
Aaron Siri
120 East 31st Street
New York, New York 10016
Tel: (212) 532-1091

*Attorneys for Plaintiff*